## **AFFIDAVIT**

Nicholas Nimeskern, first being duly sworn, deposes and says:

1. I am a Task Force Officer (TFO) with the Drug Enforcement Administration
   (DEA) in the Cincinnati Resident Office (RO) and have been since 2020.

2. I have been a police officer since 2005 and am currently employed with the City
   of Montgomery Police Department. I was previously assigned to D.A.R.T. Drug
   Abuse Reduction Task Force for several years prior to being assigned to the DEA.
   As a Task Force Agent with the DEA, my duties include the investigation of
   violations of federal law concerning the importation, manufacture, possession, and
   distribution of controlled substances as defined by Title 21, United States Code,
   Section 841 including controlled substances such as heroin, fentanyl, cocaine,
   methamphetamine, marijuana, illicitly diverted pharmaceuticals, and other
   dangerous drugs. During my current assignment with the DEA, I have specialized
   in investigations involving narcotics trafficking and numerous criminal offenses,
   including those involved in the current investigation. I have received specialized
   training on the subject of narcotics trafficking and money laundering from the
   DEA and have been personally involved in investigations concerning the
   possession, manufacture, distribution, and importation of controlled substances, as
   well as methods used to finance drug transactions. Since that time, I have
   primarily been assigned investigations dealing with the importation and
   distribution of illegal drugs, which includes cocaine, "crack" cocaine, heroin,
   fentanyl, marijuana, methamphetamine, crystal methamphetamine, and 3, 4-

methylenedioxy-methamphetamine (otherwise known as MDMA or "Ecstasy").

During those investigations, I have conducted physical surveillance, electronic

surveillance, and wire surveillance. I have also arrested numerous individuals for

various drug violations and have spoken with numerous drug dealers, gang

members, and informants concerning the methods and practices of drug

traffickers. These investigations have also included the unlawful importation,

possession with intent to distribute and distribution of illegal substances, the

related money laundering instruments, the conducting of monetary transactions

involving the proceeds of specified unlawful activities, and conspiracies associated

with criminal narcotics offenses. These investigations have resulted in the seizure

of narcotics, arrests of suspects, their prosecution, conviction, and the seizure of

large amounts of U.S. currency; seizure of real property; and have involved the

use of confidential informants; undercover agents; the analysis of pen registers,

trap and trace devices, and toll records; physical surveillances and the execution of

search warrants and arrest warrants. I have also testified in grand jury proceedings,

suppression hearings, jury trials, and have written reports and analyzed documents

in the course of investigations.

3. Based on my training and experience, I recognize that individuals involved in drug

related activities often place assets, like cell phones, residences, storage units and

vehicles, in names other than their own to avoid detection by law enforcement.

Even though these assets are in other people's names, the offenders continue to

use these assets and maintain control over them. I am also aware that these

individuals often utilize storage units to hide their illegal wares from law enforcement and that these storage lockers are often rented in other people's names. I am further aware that drug traffickers commonly use multiple cellular telephones to conduct their illicit activities. Said cellular telephones are often rotated and/or replaced with new cellular telephones on a regular basis in order to remain undetected by law enforcement.

4. I have learned through training and experience that drug traffickers and their couriers often fly on one-way tickets and usually do not make travel plans much in advance because they get last second information that the narcotics are ready or instructions and they have no idea how long the transaction will take.

5. The information in this Affidavit is based on my personal investigation and does not include all information obtained during this investigation, rather only that believed necessary to provide a legal basis for the civil forfeiture.

6. On May 4, 2022, agents from the DEA Cincinnati Resident Office received information that Davian Logan was traveling from Cincinnati to Los Angeles, on a suspicious flight itinerary: his airline ticket was purchased two (2) days before travel; and he was traveling to a known source city/state.

7. I responded to the departure gate accompanied by TFO Eli Sautter and TFO Rick Bernecker, to await the departure of the flight to Los Angeles. Once Logan's ticket was scanned and he was identified, I approached him and identified myself as a police officer. During the consensual encounter, Logon was standing in the entrance of the jet-way, free to walk away at any time.

3

8. Upon request, Logan presented a Kentucky driver's license confirming his identity. I explained that the accompanying agents/detectives and I are part of an interdiction team looking for large sums of money and/or drugs related to narcotics and/or terrorism. I asked Logan if we could search his person and checked bag, he replied by stating "yes," verbally consenting to the searches. I asked Logan how much currency, if any, he was traveling with and he replied, "I don't know man to be honest, maybe like eight thousand or something."

9. I asked again for permission to search his checked bag to verify the amount of cash in his possession. Logan again replied "yes." TFO Bernecker conducted the search of his checked bag and located several large stacks of U.S. currency rolled and hidden inside socks, shoes, and inside pockets of pants. I asked Logan why he hid the cash in that manner, and he responded, "I just was finding spots to put it in." It was immediately clear that Logan was traveling with far more than $8,000.00. I asked why he lied about the amount of cash he had. Logan replied "I have been selling Frenchies all week. I really don't know how much I got." He said he had a notebook in his backpack showing proof of all the dog sales.

10. I asked Logan if he would show me the notebook and Logan stated "yes." The notebook had handwritten notes with dollar amounts and dates of alleged dog sales. I stated to Logan that the earliest date was in March for $3,000.00. There was nothing current in the notebook, and the amounts did not come close to the amount of money Logan was traveling with and he was not able to explain the discrepancy. Logan then stated that he won a lot of the money at the Hollywood

4

Casino in Indiana. I asked if he could provide proof of his earnings at the casino, and he replied "no." Logan was unable to provide any evidence of a legal source for the cash or a reasonable explanation for traveling with so much money. Logan stated that he doesn't want to leave all his money at his place, and he went on to say that he may buy a car and some jewelry for himself and his girl.

11. I asked Logan for permission to search his cell phones to make sure they did not contain messages and/or pictures related to illegal drug trafficking. Verbal permission to search his phones was granted. Logan unlocked his phones and handed them to the agents where they viewed numerous text messages and pictures that showed Logan's involvement in illegal drug trafficking.

12. I then advised Logan that we would be seizing his cash because of the information obtained on his cell phones in addition to his earlier statements. The cash was later determined to total $158,146.00 in U.S. currency. TFO Bernecker asked if Logan wanted to sign the evidence bag as the owner possessor and he replied, "Nah fellas." Logan was asked by agents if he still wanted to fly to Los Angeles and he replied "yes," and his phones were returned to him. Logan was traveling alone and was the only person present at the time of the searches and seizure.

13. The $158,146.00 in carried by Logan was seized based upon probable cause that it was proceeds of drug-related activity or intended for such use. Several accumulating factors contributed to the officers' belief that there was probable cause that the cash was proceeds of drug-related activities, including:

5

a. travel on a recently purchased (2 days) airline ticket to a known source city/state;

b. dishonesty about how much cash he was carrying;

c. no proof of a legal source for the cash;

d. admission to not paying taxes in the past few years;

e. text messages and video's showing Logan's involvement in illegal drug trafficking; and

f. positive indication by a drug dog.

14. On or about July 21, 2022, Davian Logan filed a claim in DEA's administrative forfeiture proceeding to the $158,146.00 seized from him.

For the above-stated reasons, your affiant believes that the seized currency was furnished or intended to be furnished in exchange for controlled substances, was proceeds traceable to such an exchange, or was intended to be used to facilitate the illegal sale of narcotics and is, therefore, subject to seizure and forfeiture to the United States of America pursuant to 21 U.S.C. § 881 (a)(6).

I declare under penalty of perjury, as provided by federal law, that the foregoing statements are true.

This 17TH day of OCTOBER, 2022.

_____
Nicholas Nimeskern, Task Force Officer
Drug Enforcement Administration

6